FORD, Executor, etc., Appellant and Respondent, vs. FORD and others, Respondents and Appellants.

*April 20 — November 22, 1887.*

WILLS. *(1, 2, 12) Conflict of laws: Validity: Interpretation. (3) Instruments construed together. (4-8) Equitable conversion. (9) "Homestead" construed. (10-12) Will construed: Devise in trust: Title of executors: Perpetuities.*

1. In determining the validity of a devise the law of the place where the land is situated, and in case of a bequest the law of the testator's domicile at the time of his death, governs not only as to the form and mode of execution of the will but also as to the power of the testator to make such disposition of his property.
2. In the interpretation or construction of a will the law of the testator's domicile governs.
3. A written instrument denominated a will, and the schedules attached to and mentioned in it, will be considered as one instrument and as together constituting the will.
4. A will directed the conversion of the testator's personal property and of his lands in Wisconsin, Michigan, and Kansas,— comprising the bulk of his estate,— into rentable property in Kansas City. *Held,* that the doctrine of equitable conversion could not be applied to lands in Iowa, not mentioned in the will.
5. A will directed that certain real estate situated in Kansas City should, "at the discretion" of the executors, "either be sold and the proceeds thereof be invested in more desirable rentable property in Kansas City, or said proceeds be used in improving some

| | |
|---|---|
| 70 | 19 |
| 72 | 624 |
| 72 | 625 |
| 72 | 626 |
| 72 | 628 |
| 70 | 19 |
| 77 | 313 |
| 70 | 19 |
| 79 | 564 |
| 70 | 19 |
| 83 | 629 |
| 70 | 19 |
| 90 | 246 |
| 70 | 19 |
| 96 | 68 |
| 97 | 176 |
| 70 | 19 |
| s72 | 621 |
| 102 | 669 |
| d103 | 515 |
| 70 | 19 |
| 105 | 528 |
| 70 | 1ʋ |
| 113 | 10238 |
| 70 | 19 |
| 115 | 115 |
| 115 | 116 |
| 115 | 118 |
| 115 | 7124 |

Ford, Ex'r, etc. vs. Ford and others.

one or more of my Kansas City properties." *Held*, that this discretionary authority could not operate as an equitable conversion.

6. A will directed that moneys, etc., should, " as soon as practicable after my decease, be used either in the purchase of property in Kansas City or for improving properties in said city then on hand." *Held*, that the discretion as to time did not prevent the application of the doctrine of equitable conversion.

7. A will directed that certain scheduled properties should be converted into rentable property in Kansas City, "at schedule prices or as much better as may be." There were no negative words indicating an intent not to have the properties sold at less than the schedule prices. *Held*, that the doctrine of equitable conversion applied.

8. But where a will directed that the testator's homestead should be sold, after his widow ceased to desire it as a home, for *not less than* $10,000, or as much more as it would bring, and that the proceeds be invested, etc., the direction did not work an equitable conversion.

9. The word " homestead," as used in the will in this case, is construed to include the house and grounds where the testator lived in a city, exceeding one fourth of an acre.

10. A testator whose domicile was in Wisconsin left surviving him a widow, a son twelve years old, and three brothers. The will directed that most of his property be converted into real estate in Kansas City, Missouri; that the widow should have the use of the homestead in Wisconsin so long as she desired, and that it should then be sold and the proceeds invested in Kansas City property; that the widow should also have one fourth of the net annual income of the estate during her life; that the son should have one fourth of such income until he should come into possession of the entire estate; and that one of the brothers should have one fourth, and each of the other brothers one eighth, of such income during their respective lives. It further directed that when the son reached majority he should take in fee $10,000 worth of the testator's real estate, at the age of twenty-five he should have an additional $20,000 worth, at thirty an additional $25,000 worth, at thirty-five an additional $45,000 worth, and at forty the remainder of the estate. If the son died after reaching majority, leaving heirs, the income of $40,000 worth of the estate was to be used for the support of such heirs until they reached majority, when that sum should become theirs absolutely. If the son survived all other legatees but died before coming into possession of the whole estate, the remainder of the estate as of that date was given to Hamilton College. If the widow or one of the brothers became the sole sur-

Ford, Ex'r, etc. vs. Ford and others.

viving legatee, the estate at that time was to be divided into two parts, and such widow or brother was to have the income of one half thereof during life, and the other half was to go to Hamilton College, and after the death of such widow or brother the remaining half was to go to said college. Two of the brothers were named as executors. The widow elected to take the provision made for her by law instead of that made in the will. *Held:*

(1) The directions in the will were addressed to the executors, and they, or the one qualifying, took the legal title to the personal estate in trust for the purposes mentioned, and a like title to the real estate so far as the disposition thereof by the will is valid.

(2) The one-fourth of the income renounced by the widow cannot go to increase the annual share of the other beneficiaries, their proportion of the income being fixed by the will. Whether the accumulation of such fourth of the income into the residuum of the estate would or would not be valid, is not determined, because such income would arise from lands outside of this state.

(3) Those portions of the estate to which the son would from time to time become entitled would thereupon be segregated from the estate and be relieved from the provisions of the will, and the income thereof would no longer be payable to the beneficiaries named.

(4) So those portions of the estate to which the widow would become entitled by reason of her election not to take under the will would in like manner be segregated from the estate.

(5) If the son should die after reaching majority and before the age of forty, leaving heirs, $40,000 worth of the estate should be regarded as at once segregated from the estate, to be held in trust for such heirs by the executors.

(6) Under the will the executors take in trust a future vested estate in the homestead and a present vested estate in the other lands. But neither the son nor Hamilton College take anything more than a contingent interest. And during the continuance of the trust the *corpus* of the estate is inalienable.

(7) The will suspends the absolute power of alienation of the land for a longer period than is allowed by our statutes (i. e. for a longer period than during two lives in being), and as to the land situated in this state (the homestead) is invalid. Such homestead therefore descended to the son, subject to the rights of the widow therein.

11. To be valid, the suspension of the power of alienation must necessarily terminate, under any and all circumstances, within the period prescribed by the statute.

Ford, Ex'r, etc. vs. Ford and others.

12. Although a testator was, at the time of making his will and at the time of his death, domiciled in this state, yet if he devises land in another state or directs the conversion of any of his property into such land, the validity of any suspension of the absolute power of alienation thereof is to be determined by the courts of the state in which such land is situated; and so of the legality of accumulations of rents and profits therefrom.

APPEALS from the Circuit Court for *Dane* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

January 26, 1886, Francis F. Ford died, leaving a will bearing date January 25, 1884, which was admitted to probate in the county court of Dane county, Wisconsin, May 17, 1886, and which will and schedules annexed are to the following effect:

"Know all men by these presents, that I, Francis F. Ford, of the city of Madison, county of Dane, and state of Wisconsin, being of sound disposing mind and memory, do make, publish, and declare this to be my last will and testament, in terms following, to wit:

" (1) I direct that all my lawful debts, funeral expenses included, shall be paid as soon after my decease as practicable, out of moneys on hand, or, if need be, from the income of my estate.

" (2) It is my will, and I so direct, that the necessary expenses of carrying my estate from year to year be paid from the income thereof.

" (3) It is my will, and I so direct, that all indebtedness of any of my brothers to me shall be, and hereby is, canceled, and the legal evidences of such indebtedness shall be returned to the makers thereof.

" (4) I direct that all properties in Schedule A, attached to this instrument and bearing my signature, shall be .converted, as soon as practicable after my decease, into good rentable 'inside' property in Kansas City, Mo., at schedule prices or as much better as may be.

" (5) I also direct that the several properties in Schedule B, attached to this instrument and bearing my signature, shall, at the discretion of my executors, either be sold and the proceeds thereof be invested in more desirable rentable property in Kansas City, or said proceeds be used in improving some one or more of my Kansas City properties.

"(6) I also direct that all moneys, notes, bonds, mortgages, or other evidence of indebtedness to me from any and all parties, except my brothers, shall, as soon as practicable after my decease, be used either in the purchase of property in Kansas City or for improving properties in said city then on hand.

"(7) It is my will, and I so direct, that my wife, *Maggie*, shall have the use of my homestead, furniture, and appurtenances located on Spaight street, Madison, Wis., so long as she may desire to live in it as her home. In case at any time she cease to desire it as her home, I direct that, as soon thereafter as practicable, it be sold at a price not less than ($10,000) ten thousand dollars, or as much more as the property will bring, and the proceeds thereof be invested in good rentable property in Kansas City, Mo., and the rentals of such property be added to the income of the estate.

" (8) It is my will, and I so direct, that, in addition to said homestead and furniture, my said wife, *Maggie*, shall have one quarter of the net annual income of the remainder of my estate during her natural life, subject to modifications in article 12 of this instrument; and it is expressly stipulated that the above bequests to my said wife are in lieu of dower.

"(9) It is my will, and I so direct, that my son, *Marcus C. Ford*, shall have one quarter of the net annual income of my estate, homestead not included, until such time as, in accordance with the provisions of this will hereinafter made, he shall come into the possession of the entire estate, but the expenditure and use of said income during his minority

shall be under the control and direction of his guardian, and I appoint his mother his guardian during his minority, and, in event of her death, I appoint my brothers Edward I. and Henry T. in her place.

"(10) It is my will, and I so direct, that my brother Edward Irving shall have one quarter of the net annual income of my estate, homestead not included, during his natural life.

"(11) It is my will, and I so direct, that my brothers *Joseph C.* and Henry T. shall each have one eighth of the net annual income of my estate, homestead not included, during their natural lives.

"(12) It is my will, and I so direct, that when my son, *Marcus C.*, reaches his majority, he shall become the owner in fee of ten thousand dollars' worth of my real estate, and at twenty-five (25) years of age he shall have an additional twenty thousand ($20,000) dollars' worth, and at thirty (30) years of age he shall have an additional twenty-five thousand ($25,000) dollars' worth, and at thirty-five (35) years of age he shall have an additional forty-five thousand ($45,000) dollars' worth, and at forty (40) years of age the remainder of my estate shall become his; and I also direct that the income of my said wife, *Maggie*, shall be kept up to fifteen hundred ($1,500) dollars, any deficit to be taken from the income of my son, *Marcus C.*, and, as an offset thereto, my son, *Marcus C.*, shall be entitled to any excess in said wife's income over and above twenty-five hundred ($2,500) dollars a year.

"(13) I also direct that in the event of my son, *Marcus C.*, shall decease after reaching his majority, leaving one or more legitimate children of his body, that the income of forty thousand ($40,000) dollars' worth of my estate, or so much thereof as may in prudence be necessary, shall be used for the proper support of such child or children, until they

shall severally become of legal age, when an equal part of the above-named principal, and accrued interest, shall become his or hers absolutely.

"(14) In the event that my son, *Marcus C.*, shall survive all my other legatees, and then die before coming into possession of my whole estate, it is my will, and I so direct, that the remainder of my estate as of that date shall belong to *Hamilton College*, located at Clinton, New York, to be used in the endowment of some new professorship, and the remainder to be used, at the discretion of the trustees of said college, in the erection of some building for college uses, or in the endowment of additional professorships; such building or professorships to bear my name.

"(15) If either my wife, *Maggie*, or one of my brothers, shall become my only surviving legatee, it is my will in that event, and I so direct, that my estate at that time be divided as nearly as may be into two (2) equal parts as regards value and renting power, and said wife or brother shall then choose between the incomes of said two properties, and have and enjoy the same during his or her natural life; and it is my will that the other part of my estate·shall at that date become the property of *Hamilton College*, to be used as directed in article 14 in this instrument. And I further direct that, at the death of said wife or brother, the remaining part of my estate shall become the property of *Hamilton College*, to be used as in article 14.

" I hereby appoint my two brothers *Joseph C.* and Henry T. Ford as executors of this, my last will and testament.

" In witness whereof, I, Francis F. Ford, have to this, my last will and testament, consisting of four sheets of paper, subscribed my name and affixed my seal at Madison, Wis., this twenty-fifth (25) day of January, 1884.

[Signed]          " Francis F. Ford." [Seal.]

The lands described in Schedule A were situated and therein priced as follows: Homestead, in Madison, Wis.,

priced at $10,000; lands in Kalamazoo, Mich., priced in the aggregate at $27,000; about 1,508 acres of land in the state of Kansas, priced in the aggregate at $38,500. The lands described in Schedule B were situated in Kansas City, Missouri, and therein priced in the aggregate at $19,200.

The plaintiff, as the qualified executor, commenced this action in the circuit court for Dane county for the construction of said will so probated in the county court, whereupon the widow, *Margaret G. Ford*, and *Marcus C. Ford*, the only child of said testator, by his guardian *ad litem*, and *Hamilton College*, respectively, answered the complaint, which complaint and answers were severally amended by leave of the court.

Prior to the trial it was stipulated by the respective parties, in effect, "that the printed laws and decisions and revised statutes" in our state law library, "for the states of Missouri, Kansas, Michigan, and Iowa (and of the state of New York, for the purpose of proving the incorporation of the trustees of *Hamilton College*)," might "be referred to by any and all of the parties herein to show what the law of any of said states" was "as to any of the legal points involved in or that" might "arise in said case, either in the circuit or supreme court of this state," and that it "should not be necessary to introduce in evidence any of said statutes, laws, or reported decisions; but that any of the parties herein" should "have the right to use or refer to same as evidence herein."

In addition to what has been stated, it appeared from the undisputed evidence, and was found as facts upon the trial, in effect, that the testator died testate at the age of fifty-eight years, in Kansas City, Missouri, January 26, 1886, leaving said will. That, at the time of his death, he was a resident of and domiciled in the city of Madison, Dane county, Wisconsin, and had been for ten years immediately prior thereto. That he left him surviving, his widow, the

said *Margaret G.*, then aged forty-six years; and one child, a son, the said *Marcus C.*, then aged twelve years; and three brothers, Edward Irving Ford, then living at Asbury Park, New Jersey, and aged sixty years; *Joseph C. Ford*, then residing in Madison, Wisconsin, and aged fifty-five years; and Henry Thornton Ford, then living at Jersey City, New Jersey, and aged fifty-three years; and that all of said persons were still living. That he left, him surviving, no sister, father, or mother. That said will was admitted to probate as stated. That thereupon letters testamentary were issued by said county court to *Joseph C. Ford*, the plaintiff, who thereupon qualified as executor and has ever since acted and still acts as such.

That, at the time of his death, the testator's estate was worth about $175,000, and located in the states of Wisconsin, Michigan, Iowa, Kansas, and Missouri. That the great bulk of said estate was located in the states of Kansas and Missouri. That the personal estate of said testator consisted of certain household goods and furniture, and other personal property, such as wagons, sleighs, etc., in Madison, Wisconsin, and certain rents due him on real estate. That a short time prior to his death the testator assigned, or attempted to assign, in writing to his brother Henry Thornton Ford certain notes and mortgages, amounting in value to about $30,000, to determine the title to which a suit was then [at the date of the findings] pending in Kansas City, Missouri, where said securities were at the time of the testator's death. That the only real estate belonging to the testator at the time of his death, within the state of Wissin, was his homestead in Madison, of the value of about $12,000, exclusive of any furniture therein. That the testator had about 200 acres of land in Iowa at the time of his death, or an interest therein. That the lands so described in said schedules in Michigan, Kansas, and Missouri were worth, at the time of his death, and were still worth, the

value placed upon the same by him in said schedules as stated. That February 15, 1887, the said widow renounced and surrendered one and all the provisions of every kind made for her in said will, and, instead thereof, elected to take under the statutes of the several states named.

That the *Trustees of Hamilton College* were, and have been since May 6, 1812, a corporation duly organized and existing under and by virtue of the laws of the state of New York as a college, and entitled, by virtue of their charter, to take, hold, enjoy, and have lands and real estate, in fee-simple, or for a term of life or lives, or for years, or in any other manner, and also goods, chattels, books, moneys, annuities, and all other things of what kind or nature soever. That said corporation has exercised the usual powers of a college for over forty years. That it is generally known and spoken of as *Hamilton College*, at Clinton, Oneida county, New York. That the testator graduated at said college in the class of 1851. That he meant and intended, by the words "*Hamilton College*," used in the will, the said "*Trustees of Hamilton College*."

That by the laws of Missouri and Kansas the vesting of estates may be postponed, and a suspension of the power of alienation is permitted, for a period of any number of lives in being and twenty-one years and the period of gestation thereafter, according to the rule of the common law. That the same period is permitted by statute in Iowa. That the law of Michigan in this respect, both as to real and personal property, is substantially the same as in Wisconsin.

As conclusions of law the court found, in effect, that the will was valid in all its parts, and no part of it within the provisions of the statutes of this state against perpetuities or the suspension of the power of alienation, and construed it accordingly. The plaintiff, said widow, the said guardian for said *Marcus C.*, and said *Trustees of Hamilton College*, severally filed exceptions to said conclusions of law and

such construction of said will, and from the judgment entered upon said findings of fact and conclusions of law they severally appeal to this court.

*I. C. Sloan* and *John M. Olin*, for the executor, argued, among other things:

1. The will creates a power in trust, and not a trust estate, in the executors. In discussing this proposition it is admitted, for the time being, that if held to create a trust estate the will violates the rule against perpetuities. Courts will so construe wills as to raise by necessary implication a trust estate for the purpose of sustaining them, but never for the purpose of defeating them. *Tucker v. Tucker*, 5 N. Y. 408; *Post v. Hover*, 33 id. 593; *Robert v. Corning*, 89 id. 225. If there is a mere trust power in the executors there is no suspension of the power of alienation, for there is no estate to be created in the future by the execution of any power. The estate is created by the will; and it is vested in *Marcus*, subject to be divested under certain contingencies.

2. If it is held that the will creates a trust estate, the persons named as executors are the persons whom the testator intended should execute the trust. *Saunderson v. Stearns*, 6 Mass. 38; *Hall v. Cushing*, 9 Pick. 407; *Dorr v. Wainwright*, 13 id. 329; *Nash v. Cutler*, 19 id. 70; *Carson v. Carson*, 6 Allen, 398; *Smith v. Fellows*, 131 Mass. 20; *Nutter v. Vickery*, 64 Me. 490; *Pettingill v. Pettingill*, 60 id. 410; *Howard v. Am. Peace Soc.* 49 id. 306; *Groton v. Ruggles*, 17 id. 137; *Craig v. Craig*, 3 Barb. Ch. 76; *Brewster v. Striker*, 2 N. Y. 19; *Tobias v. Ketchum*, 32 id. 319; *Van Steenwyck v. Washburn*, 59 Wis. 483; *Mather v. Mather*, 103 Ill. 607; *Scott v. West*, 63 Wis. 558; *Webster v. Morris*, 66 id. 399.

3. On the theory that the will creates a trust estate, the executors are entitled to the possession, management, and control of the testator's estate during the continuance of

the trust, and they take under the will a legal estate such as is necessary to enable them to execute the trust. Such estate, however, will continue no longer and be no greater in extent than the execution of the trust demands. R. S. sec. 2087; *Nicoll v. Walworth*, 4 Denio, 388–9; *Doe v. Considine*, 6 Wall. 458; *Upham v. Varney*, 15 N. H. 462; *Morton v. Barrett*, 22 Me. 257. In case *Marcus* lives to be forty years of age the estate goes to him in possession and enjoyment, freed from any and all charges in favor of the other legatees named in the will, and the trust estate terminates at that time under the above condition. Construing articles 10 and 11 of the will together with article 12, and the meaning of the testator evidently is that the brothers and widow shall have the specified portions of the annual income during their natural lives, but not however beyond the period when *Marcus* shall reach forty years of age. The respective ages of the brothers and widow make this intention clear. It is only in case *Marcus* dies under forty years of age that the trust estate in the executors can, under any theory of the case, continue beyond the period of twenty-nine years, that is, beyond the period when *Marcus*, if he had lived, would have been forty years of age. But even if the court holds that the will creates a trust estate, this estate would not continue beyond the life of *Marcus*, in case he died under forty, if such construction would defeat any of the provisions of the will.

4. Subject to the execution of the power of trust, the whole estate of the testator, immediately upon his death, became vested in interest or right in *Marcus*, his son, subject to be divested as follows: (1) In case *Marcus* dies before reaching his majority, surviving all the other legatees, the entire estate vests in *Hamilton College*. In case the other legatees are surviving, it vests in *Hamilton College* subject to the payment of incomes to the legatees as provided in the will, until such time as either the widow or

one of the brothers becomes the only surviving legatee, in which event one half of the estate vests absolutely in possession in *Hamilton College*, and the other half continues vested in interest and right subject to the payment of the income from the same to such surviving legatee during life; and upon his or her death such other half vests absolutely in enjoyment and possession in *Hamilton College*. (2) In case *Marcus* dies after reaching majority and before reaching forty, that portion of the estate which he may have come *into possession* of at any time between twenty-one and thirty-five, would descend to his heirs; and $40,000 of the estate that had not yet gone to *Marcus* in possession under article 12, would vest in interest or right in the children of *Marcus* under article 14, freed from any charge as to incomes in favor of the legatees; and the remainder of the estate, *as of that time*, would vest in right or interest in *Hamilton College*, subject to payment of incomes to the other surviving legatees as above stated. (3) In case *Marcus* dies after reaching majority, but before forty, without leaving any child or children surviving, but leaving surviving the other legatees or more than one of them, the estate would go as stated under the second hypothesis, except as to the $40,000. (4) In case *Marcus* dies after reaching majority but before forty, without issue, and surviving all the other legatees, then such of the estate as has not gone into possession of *Marcus* vests absolutely in *Hamilton College*, and such of the estate as has vested in *Marcus* in possession goes to his heirs. (5) In case *Marcus* dies after reaching majority, but before forty, leaving no issue, but leaving surviving him one of the brothers or the widow, the one-half of such of the estate as had not gone in possession to *Marcus* vests absolutely in possession in *Hamilton College*, and the other half vests in right or interest in *Hamilton College* subject to the payment of the income therefrom to the surviving brother or widow during his or her life; and such

portion as had already vested in possession in *Marcus* would descend to his heirs freed from any charge in favor of such surviving legatee.    In case *Marcus* left issue surviving, and the other conditions of the above hypothesis remained the same, the property would go as above stated, save as to the $40,000.

The contention is, then, that *Marcus* takes a vested remainder in the entire estate, subject to be divested upon the happening of a condition subsequent.    *Hamilton College* and the children of *Marcus*, if he have any, take a contingent interest by way of executory devise; but such interest will become vested upon the death of *Marcus* under forty years of age.    If *Marcus* takes such vested estate, then the will does not suspend the absolute power of alienation, so far as it creates a legal estate, and, so far, is not in violation of any rule in any state against perpetuities.    It is the policy of the law to have estates vested if possible, and at the earliest date possible.    *McArthur v. Scott*, 113 U. S. 378; *Shattuck v. Stedman*, 2 Pick. 469; *Tayloe v. Mosher*, 29 Md. 450; *Doe v. Considine*, 6 Wall. 458.    When words of condition or contingency are used in a will, which may be construed as applying to the *gift itself*, or to the *time of payment*, the courts are inclined to construe them as applying to the time of payment, and to hold the gift as vested rather than contingent.    *Dale v. White*, 33 Conn. 294, 296; *Johnson v. Valentine*, 4 Sandf. 43; *Moore v. Lyons*, 25 Wend. 119; *Boraston's Case*, 3 Coke, 19; *Rives v. Frizzle*, 8 Ired. Eq. 239; Gray's Rule against Perpetuities, sec. 103; 2 Washb. on R. P. 252, sec. 27.    That the interest of *Marcus* is a vested remainder, see, also, Gray's Rule against Perpetuities, secs. 9, 101; 2 Redf. on Wills, 225, sec. 18; *Lunt v. Lunt*, 108 Ill. 307; *Buel v. Southwick*, 70 N. Y. 581; *Blanchard v. Blanchard*, 1 Allen, 227; *Scott v. West*, 63 Wis. 568.    And that a vested estate, if a legal one, does not violate the rule against perpetuities, see Gray's Rule against Perpetuities,

secs. 99, 205, 209, 235–246; *Webster v. Morris*, 66 Wis. 383; *Seaver v. Fitzgerald*, 141 Mass. 401; *Loring v. Blake*, 98 id. 253; *Lovering v. Worthington*, 106 id. 86; *Simonds v. Simonds*, 112 id. 157; *Toms v. Williams*, 41 Mich. 552; *Farnam v. Farnam*, 53 Conn. 261; *Gilman v. Reddington*, 24 N. Y. 18, 19; *Everitt v. Everitt*, 29 id. 75, 81, 82; *In the Matter of the Episcopal Pub. School*, 31 id. 589; *Manice v. Manice*, 43 id. 303.

Under our statutes, however, if a trust estate is created which extends beyond the period allowed by law, the rule against perpetuities is violated, notwithstanding the estate may be vested, for the reason that there are no persons in being who can convey an absolute fee in possession as the statute requires. This changes the rule at common law, for at common law when the equitable interest was vested in the *cestui-que-trust*, he, by joining with the trustee, could convey a perfect title. *Bowditch v. Andrew*, 8 Allen, 339; *Otis v. McLellan*, 13 id. 339. See *Coster v. Lorillard*, 14 Wend. 265; *Hawley v. James*, 16 id. 61; *Tucker v. Tucker*, 5 N. Y. 419; *Amory v. Lord*, 9 id. 403; *Savage v. Burnham*, 17 id. 562; *Everitt v. Everitt*, 29 id. 70, 71; *Post v. Hover*, 33 id. 600, 601; *Garvey v. McDevitt*, 72 id. 556, 562, 564. These cases make plain the difference in effect upon the validity of a will in New York and Wisconsin, between a trust estate in the executors, and mere trust powers.

If the devise to *Marcus* does not violate the rule against perpetuities, his interest will not be defeated or affected, even though it is held that the will provides for a trust estate which, in case *Marcus* dies under forty, is to continue beyond the period allowed by law. The court will separate the valid from the invalid portions of the trust estate, in such a case, and sustain the valid portions, unless they are so interwoven with the invalid that one cannot stand while the other falls. *Kane v. Gott*, 24 Wend.

666; *Parks v. Parks*, 9 Paige, 117–120; *Emmons v. Cairns,* 2 Sandf. Ch. 379; *Woodruff v. Cook*, 47 Barb. 307; *Savage v. Burnham*, 17 N. Y. 561; *Post v. Hover*, 30 Barb. 312; *S. C.* 33 N. Y. 597–8; *Leavitt v. Wolcott*, 65 How. Pr. 51; *Everitt v. Everitt*, 29 N. Y. 79–82; *Oxley v. Lane*, 35 id. 340, 347–350; *Harrison v. Harrison* 36 id. 547–8; *Van Schuyver v. Mulford*, 59 id. 426; *Tiers v. Tiers*, 98 id. 572–3.

The legacies are separate and not joint, and the law, while recognizing that there is one trust, will separate it into parts and consider them separately. In this light, even in case *Marcus* dies under forty leaving all the other legatees surviving, the trust estate does not suspend the power of alienation beyond two lives in being at most, that is, during the life of *Marcus* and the life of the legatee to whom a separate portion of the estate is given. *Bulkley v. Depeyster*, 26 Wend. 26, 27; *Savage v. Burnham*, 17 N. Y. 571; *Everitt v. Everitt*, 29 N. Y. 84; *Stevenson v. Lesley,* 70 id. 512; *Monarque v. Monarque*, 80 id. 324; *Wells v. Wells*, 88 id. 332; *Tiers v. Tiers*, 98 id. 572.

5. The whole of the testator's estate is to be considered as real estate in Kansas City, under the doctrine of equitable conversion. This being so, the laws of Missouri and not of Wisconsin are to govern on the question whether the will is in violation of the rule against perpetuities. *Wood v. Wood*, 5 Paige, 596; *Bascom v. Albertson*, 34 N. Y. 584; *Chamberlain v. Chamberlain*, 43 id. 434–5; *Knox v. Jones*, 47 id. 395; *Hawley v. James*, 7 Paige, 213; *Despard v. Churchill*, 53 N. Y. 200; *Succession of Packwood*, 12 Rob. (La.), 334; *Bryan v. Moore*, 11 Martin (La.), 26; *De Renne's Estate*, 12 Weekly Notes Cas. 94; *Vansant v. Roberts*, 3 Md. 128; *Fordyce v. Bridges*, 2 Phil. 497; *Att'y Gen. v. Mill*, 2 Dow & C. 402; *Att'y Gen. v. Stewart*, 2 Meriv. 143; *Heywood v. Heywood*, 29 Beav. 9; *Draper v. Harvard College*, 57 How. Pr. 269.

6. The widow having refused to take under the will, the portion of the net income devised to her should be distributed among the other legatees.

7. In case of the death of any of the legatees, leaving *Marcus* surviving, the net income that would go to such legatees, if living, will be accumulated for the benefit of *Marcus*, as the owner of the next eventual estate, until he reaches twenty-one years of age, and then go to him absolutely. In case he dies under twenty-one, such accumulations, if any, would go to *Hamilton College*, as the owner of the next eventual estate.

For *Marcus C. Ford* there were briefs by *Pinney & Sanborn*, and oral argument by *Mr. Pinney*. They contended, *inter alia*, that the trust provisions of the will for collecting and paying over the *net* income of the estate, and those in favor of *Hamilton College*, are invalid as to the real estate in Wisconsin and in Michigan, as being in contravention of the statute against perpetuities; the will creating an illegal suspension of the power of alienation of an absolute fee in possession. It is immaterial, so far as this objection is concerned, whether the title to the real estate vested in the executors as trustees, or the fee went to the heir at law and the executors took simply a power in trust, or whether the provisions in question are to be considered as executory devises or as legal estates either vested or contingent, for in neither case can any valid interest or estate be vested contrary to the statute against perpetuties.

The executor took the entire fee of the real estate. This is the manifest meaning and purpose of the will, and the execution of its provisions requires it. A mere power would not suffice. *Scott v. West*, 63 Wis. 556–563; *Leggett v. Perkins*, 2 N. Y. 305; *Brewster v. Striker*, id. 19, 27–38; *Tobias v. Ketchum*, 32 id. 319; *Bennett v. Garlock*, 79 id. 302; *Brewer v. Brewer*, 11 Hun, 147. The provisions for paying over the *net* income in fourths and eighths, and the

setting off part of the estate under the twelfth clause of the will for *Marcus*, and under the thirteenth clause for his children, are all express trusts under subd. 3, sec. 2081, R. S. While these trusts exist the trustee cannot convey an absolute fee in possession (R. S. sec. 2091); nor can the parties beneficially interested in the trust for the payment of the rents and profits convey their interest. R. S. sec. 2089. During the existence of these trusts or *either* of them, therefore, there is no one person or number of persons who can convey an absolute fee in possession. *Hawley v. James*, 16 Wend. 60, 121-2, 164-5; *Coster v. Lorillard*, 14 Wend. 265; *Garvey v. McDevitt*, 72 N. Y. 556, 562. If these provisions are valid as trusts, they cannot be sustained as powers in trust. If the trusts and estates limited thereby to *Hamilton College* and others are void, powers in trust for the same purpose are not valid for any purpose whatever. The power of alienation is as effectually suspended by a power in trust as by an express trust or any other means.

Whether a will violates the statute against perpetuities depends upon facts existing at the time it is made, or certainly at the death of the testator. Subsequently occurring events cannot aid it or validate it. And to defeat the estates attempted to be created it is not necessary to show that the provisions of the will when carried out will cause an illegal suspension of the power of alienation; it is sufficient that in the natural course of events such a result may happen. R. S. secs. 2037-2039, 2089, 2091, 2152. *Hawley v. James*, 16 Wend. 60; *Amory v. Lord*, 9 N. Y. 403; *Boynton v. Hoyt*, 1 Denio, 53; *Kilpatrick v. Johnson*, 15 N. Y. 322; *Schettler v. Smith*, 41 id. 328, 347; *Garvey v. McDevitt*, 72 id. 556; *De Wolf v. Lawson*, 61 Wis. 474-5. *Marcus* may die before reaching the age of twenty-one, or after and before reaching forty, leaving his mother and one or more or all three of his uncles surviving him; and in such case

the trust or power in trust must continue until the death of the survivor of the four, or during the continuance of five lives in being. The provisions, therefore, which may suspend or cause the suspension of alienation of an absolute fee in possession, are void, and the remainders over for *Hamilton College*, limited upon such provisions, must fail. *Jennings v. Jennings*, 7 N. Y. 547; *Amory v. Lord*, 9 id. 411, 412; *Field v. Field*, 4 Sandf. Ch. 546; *Knox v. Jones*, 47 N. Y. 389. The terms of the will require that the *estate* shall be held inalienable and intact until the death of the survivor of the five persons, or four at least of them, for whose benefit the rents and profits were to be collected and the net income paid over in fourths and eighths. The trust estate for the payment of such *net* income is an entirety, and is not capable of severance or apportionment, and cannot be cut down to meet the requirements of the statute. It must stand or fall as an entirety. *Hawley v. James*, 16 Wend. 169, 172, 129–133. These provisions for fourths and eighths of the *net income* do not give to each of the beneficiaries a life estate to the extent of his or her fractional interest. The gift is not of the rents and profits, nor of the income in gross. These are *pecuniary legacies of indeterminate sums*, payable annually, and not devises of legal estates.

If the real estate in Wisconsin and Michigan is considered as equitably converted into real estate in Missouri, the result would be that, in administering the estate situated in the state of the testator's domicile, the courts of this state would be compelled to administer it in part, not according to the law of its *situs* and of their jurisdiction, but according to the law of Missouri. Trusts which would be void as suspending the power of alienation for more than two lives in being are not rendered valid because of there being granted to the trustee *power to sell* the trust property, the proceeds to remain and be subject to the execution of the trusts; and

this rule applies to a sale and investment of the proceeds in real estate in a state by the laws of which such trusts would be valid. *Brewer v. Brewer*, 11 Hun, 147; *Brewer v. Penniman*, 72 N. Y. 603; *Hobson v. Hale*, 95 id. 588, 604–611; *Hawley v. James*, 5 Paige, 445; *S. C.* 16 Wend. 163–4. If the law of the testator's domicile limits his capacity in the disposal of his property by will, a gift in contravention of such law would be void everywhere. In relation to the suspension of ownership and of the power of alienation, each state is sovereign as to all property within its limits, whether real or personal. *Chamberlain v. Chamberlain*, 43 N. Y. 433–4; 53 id. 192; 46 id. 162; 79 id. 327, 343, 358; 95 id. 605, 609. Whether the provisions in question would be valid or void under the laws of Missouri can only be authoritatively determined by the courts of that state. *Knox v. Jones*, 47 N. Y. 395; *Van Steenwyck v. Washburn*, 59 Wis. 483. But if this court should consider the question of the validity of the provisions of the will under those laws, it is submitted that the fourteenth provision, by which a contingent remainder is limited to *Hamilton College*, is void as not being limited upon a single or near possibility, but upon a double one, to wit: (1) that *Marcus* "shall survive all my other legatees;" and (2) then "die before coming into possession of my whole estate." 2 Blackst. Comm. 170; Fearne on Cont. Rem. 176; *Cholmley's Case*, 2 Coke, 51; *Lampet's Case*, 10 id. 50*b; Dennett v. Dennett*, 40 N. H. 503; 4 Kent's Comm. 206.

The provisions in favor of *Hamilton College* create future *contingent* estates by way of conditional limitation in its favor, and these provisions create *trusts for charitable purposes*, which, *Hamilton College* being a foreign corporation, are void as not within sec. 2081, R. S., and because they create a perpetuity in violation of sec. 2038. Perry on Trusts, secs. 687, 689, 692, 704–5; *Jackson v. Phillips*, 14 Allen, 558; *Webster v. Morris*, 66 Wis. 398; *Ould v. Wash-*

*ington Hospital*, 95 U. S. 312; *Ruth v. Oberbrunner*, 40 Wis. 266–7; *Heiss v. Murphey*, id. 289; *Methodist Church v. Clark*, 41 Mich. 740, 741; *Phelps v. Pond*, 23 N. Y. 69; *Levy v. Levy*, 33 id. 97; *Bascom v. Albertson*, 34 id. 584; *Gram v. Prussia E. E. L. G. Soc.* 36 id. 161; *Holmes v. Mead*, 52 id. 332.

The share of the net income bequeathed to the widow, now that she has renounced, goes to *Marcus* as the presumptive owner of the next eventual estate, there having been no lawful provision made for accumulation. *Hawley v. James*, 16 Wend. 134; *Scott v. West*, 63 Wis. 584; *Manice v. Manice*, 43 N. Y. 386–7; *Gilman v. Reddington*, 24 id. 10, 19; *Schettler v. Smith*, 41 id. 339, 340; *Pray v. Hegeman*, 92 id. 517–520. If the disputed provisions of the will are invalid, the result is the same and the income goes to *Marcus* as heir at law. The "estate" of the testator consisted only of that which he could effectively dispose of by will as against his wife. *Adsit v. Adsit*, 2 Johns. Ch. 448, 450; *Church v. Bull*, 2 Denio, 430. The bequests to the testator's wife, his son, and his three brothers are specific legacies — are for specific shares of a definite fund. If the fund is reduced by the disclaimer of the widow, or if it fails, the rights of *Marcus* and of the brothers will be correspondingly reduced or fail altogether. 2 Redf. on Wills, 718, note 93, 472, 462; 3 Pom. Eq. Jur. sec. 1130; *Walton v. Walton*, 7 Johns. Ch. 264; *Farnum v. Bascom*, 122 Mass. 282; *Chase v. Lockerman*, 11 Gill & J. 185; *Gilbreath v. Winter*, 10 Ohio, 64; *Towle v. Swasey*, 106 Mass. 100. When either of the brothers dies, the annual net income theretofore paid to him does not go to increase the shares of the survivors, but lapses. None of these legatees can in any event get more than his fourth or eighth. When any portions of the estate pass to *Marcus* absolutely under the twelfth clause of the will, and when the $40,000 shall be set aside under the thirteenth clause, the *estate* will be correspondingly reduced,

and no income can be charged upon or derived from such portions for the benefit of the other legatees, but their *net* income will be correspondingly diminished.

For *Margaret G. Ford*, the widow, there was a brief by *Stevens & Morris*, and oral argument by *Mr. Stevens*. They argued, among other things, that the provisions of the will, if valid, vested the property, real and personal, in *Joseph C. Ford, as trustee*. The trust estate thus vesting arises after the conversion of the property into real estate in Kansas City, and in a certain contingency continues during five lives in being, and therefore violates the provisions of sec. 2039, R. S.

The trust arises after, and depends upon, the conversion directed, and does not attach to the estate unless so converted. The direction of the will to be effectual as a conversion, and in this case a double conversion, must be (1) imperative; (2) absolute, unconditional, and freed from contingency; and (3) for a lawful purpose. 1 L. C. in Eq. (ed. 1852), 604–5, 612, 615; 3 Pom. Eq. Jur. 1169–70, 1172–78; Watson's Compendium of Equity, 105; Schouler, Ex'rs, secs. 217, 463; *Comm. v. Gordon*, 7 Atl. Rep. (Pa.), 229; *Storer v. Zimmerman*, 21 Pa. St. 394; *Gordon's Appeal*, 4 Atl. Rep. (Pa.), 739; *Bogert v. Hertell*, 4 Hill, 492; *Hawley v. James*, 5 Paige, 318–444; *S. C.* 7 id. 213–219; *King v. Rundle*, 15 Barb. 150; *Hewitt v. Wright*, 1 Bro. C. C. 86; 2 Story's Eq. Jur. sec. 1183. The direction is imperative, but not absolute or unconditional. It is to sell " at schedule prices, or as much better as may be." This does not authorize a sale at less than schedule prices, and those may never be offered. Nor is the direction for a lawful purpose, since it creates a trust and estates in remainder which are void. The claim that the trust would be valid under the law of Missouri, and hence that it should be sustained here, would practically make the Wisconsin statute against perpetuities a dead letter. To avoid the

statute it would only be necessary to° direct a conversion and appoint nonresident trustees. This court will not undertake to determine what may be the law as to perpetuities in other states. *Hawley v. James,* 16 Wend. 281; *Knox v. Jones,* 47 N. Y. 395; *Van Steenwyck v. Washburn,* 59 Wis. 483; *Despard v. Churchill,* 53 N. Y. 192; *McCartney v. Osburn,* 9 N. E. Rep. (Ill.), 210. The direction as to the properties in Schedule B is at the discretion of the executors, and hence not *imperative* so as to work a conversion. The direction as to the homestead is not absolute or unconditional, for it is not to be sold for less than $10,000. The personal property of the estate is Wisconsin property, and the direction as to its conversion is in violation of Wisconsin law. The provisions of the entire will as to this personal property make of it a devise of real estate upon trust and with remainders which are prohibited by our statute. See *Wood v. Wood,* 5 Paige, 596; Gray's Rule against Perpetuities, secs. 259–267.

If the directions to convert are ineffectual, the property remains undisposed of and goes to the heir at law. *Comm. v. Gordon,* 7 Atl. Rep. (Pa.), 229; *Gordon v. Ingraham,* 29 Hun, 221. The entire trust and remainders thereon are void, inasmuch as, shorn of the property in relation to which conversion fails, it fails to carry out in any sense the general intent and purpose of the testator. There is nothing in the will from which the court may infer that the testator would have created the trust limited and restricted as to the property, if any, upon which it may act. *Harris v. Clark,* 7 N. Y. 242; *Amory v. Lord,* 9 id. 403; *Rice v. Barrett,* 102 id. 161.

As to the power of *Hamilton College* to take under the will, see ch. 360, Gen. Laws of N. Y. for 1860, which provides that "no person having a husband, wife, child, or parent shall devise or bequeath to any benevolent, charitable, literary, scientific, or missionary society, association,

or corporation, in trust or otherwise, more than half his estate after paying debts," etc.  The devise to *Hamilton College* is void.  *Mapes v. Am. Home Miss. Soc.* 33 Hun, 360; *White v. Howard,* 38 Conn. 342; *Kearney v. Miss. Soc.* 10 Abb. N. C. 274; *Sherwood v. Am. Bible Soc.* 1 Keyes, 565; *Lawrence v. Elliot,* 3 Redf. 235.

For *The Trustees of Hamilton College* there were briefs by *Gregory, Bird & Gregory,* and oral argument by *J. C. Gregory* and *Charles N. Gregory.*  They argued at length in support of the following propositions: 1. The interest of *Hamilton College* is an estate limited by way of executory devise while *Marcus* lives and is under forty years of age. 2. In the event of his death under forty, *Hamilton College* takes at once a vested estate in fee in the undistributed residue, subject only to the right of the life legatees then surviving to a designated share of the rents and profits thereof. 3.  All estates devised under the will vest either in *Marcus* on his reaching the designated age, or in *Hamilton College* on his dying under forty years, and therefore they all vest within one life in being and there is no offense to the statute against perpetuities on account of remoteness in vesting. 4. There is no unlawful suspense of the power of alienation by reason of any trust in the executor.  (1) Because the only trust in him is a trust by implication, and no such trust will be declared for more than such lawful period as can be sustained and will effectuate the intent of the testator, however plainly intended or however convenient it might otherwise be.  (2) Because a trust, if raised, would not suspend the power of alienation after all interests were vested, unless a trust for the receipt of the rents and profits of lands, as otherwise the trustee and *cestui-que-trusts* and residuary devisee might at any time join in conveying the fee.  The only realty in Wisconsin is the homestead and there is no gift of the rents and profits thereof, but they are expressly excepted from all gifts of the income of the

estate, and the sole power of the executor in relation thereto is to care therefor so long as the widow makes her home therein and then to sell it for a sum within its present value as shown by all the testimony, his right to sell being so limited upon one life in being at the utmost. 5. Even if it were decided that a trust must be declared which would operate to suspend the power of alienation for the lives of all the life legatees, yet as the only realty in Wisconsin is ordered sold at the termination of its use by the widow, there must be a conversion within one life in being, and the proceeds might be held at home in Wisconsin for any number of lives in being without offense to the statute, and may then certainly be invested in Missouri as directed in property there, upon limitation which Missouri law permits for the same number of lives in land. 6. The accumulation of any portion of the income of the estate which is undisposed of by reason of the death or renunciation of any legatee must be intended. 7. Such accumulation is for the benefit of *Marcus* as residuary legatee and devisee while he lives and is under forty. It is valid and must be sustained and such income accumulated during his minority but for no longer period, and after that he takes such portion of the income directly, as entitled to the next eventual estate, but not the accumulations which have passed to and become part of the estate. 8. In case of his death under forty, *Hamilton College*, as owning the land or its proceeds, is entitled to such undisposed of income.

Under the statute of New York, cited by counsel for *Margaret G. Ford*, the value of the gift to *Hamilton College* must be ascertained by valuing the estate in gross at the testator's death, and then deducting all preceding life estates, annuities, or paramount gifts. If the residue going to the corporation is not, at the death of the testator, worth on the doctrine of probabilities and by the tables to exceed

one half in value of the estate, it does not offend.   *Hollis v. Drew Theolog. Sem.* 95 N. Y. 166.

The following opinion was filed June 1, 1887:

CASSODAY, J.   At the time of the testator's death, and for several years immediately prior thereto, his residence and domicile were in the city of Madison, Wisconsin.   As stated, he left personal property, and large amounts of valuable lands in Wisconsin, Michigan, Iowa, Kansas, and Missouri. His widow and little boy, *Marcus C.,* and his three brothers and *Hamilton College,* are the sole objects of his bounty. The will is unique.   It is said to have been drawn by the testator himself.   It may be doubtful whether it would have presented more intricate questions for solution had it been drawn by a skilful lawyer with that end in view.   Its validity is challenged as a whole and in parts, and a construction is demanded.   The language employed seems to be sufficiently clear to indicate the purposes intended.   The difficulties arise in applying the law to such purposes.   Before proceeding to make such application it may be well to state a few general rules of law applicable to the case, readily deducible from the authorities and virtually conceded by all.

1. The validity of every devise or disposition of real estate by will must be governed by the law of the place where the land is situated, and this includes not only the form and mode of the execution of the will, but also the lawful power and authority of the testator to make such disposition.   Story, Confl. Laws, § 474, and note; 2 Greenl. Ev. § 670; 1 Redf. Wills, 398, subd. 8; *Robertson v. Pickrell,* 109 U. S. 608; *White v. Howard,* 46 N. Y. 144.   The importance of this proposition in considering the validity of a will covering lands in so many different states will be appreciated by all.

2. On the contrary, although not as well defined, nor as extensively enforced, yet the authorities clearly support the proposition that the validity of a bequest or disposition of personal property by last will and testament must be governed by the law of the testator's domicile at the time of his death, and this includes not only the form and mode of the execution of the will, but also the lawful power and authority of the testator to make such disposition; and especially is this true where, as here, the testator's domicile at the time of making his will continues to be the same until the time of his death. Story, Confl. Laws, §§ 467, 468; *Stewart v. McMartin*, 5 Barb. 438; *Moultrie v. Hunt*, 23 N. Y. 394; *Nat v. Coons*, 10 Mo. 543; *Desesbats v. Berquier*, 1 Bin. 336; *S. C.* 2 Am. Dec. 448; *Somerville v. Somerville*, 5 Ves. Jr. 750, 786; *Anstruther v. Chalmer*, 2 Sim. 1; *Price v. Dewhurst*, 8 Sim. 279; *S. C.* on appeal, 4 Mylne & C. 76; *Enohin v. Wylie*, 8 Jur. (N. S.), 897; *S. C.* 10 H. L. Cas. 1; *Crispin v. Doglioni*, 8 Jur. (N. S.), 653; *S. C.* on appeal, L. R. 1 H. L. App. Cas. 301; *Eames v. Hacon*, L. R. 16 Ch. Div. 407; *S. C.* on appeal, L. R. 18 Ch. Div. 347. This is not shaken by the criticism of Lord WESTBURY's opinion in *Enohin v. Wylie*, *supra*, by the Earl of SELBORNE, L. C., in *Ewing v. Ewing*, L. R. 9 App. Cas. 39.

3. The same rule, as to the law of the testator's domicile, governs in the interpretation or construction of wills. Story, Confl. Laws, §§ 479a–479c; *Van Steenwyck v. Washburn*, 59 Wis. 510. In the words of Mr. Justice STORY: "The language of wills is not of universal interpretation, having the same precise import in all countries and under all circumstances. They are supposed to speak the sense of the testator according to the received laws or usages of the country where he is domiciled, by a sort of tacit reference, unless there is something in the language which repels or controls such a conclusion." *Harrison v. Nixon*, 9 Pet. 504; *Trotter v. Trotter*, 4 Bligh (N. S.), 502; *Enohin v. Wylie*, *supra*;

*Chamberlain v. Napier,* L. R. 15 Ch. Div. 614. The general rule is the same respecting real estate, whenever the object is merely to ascertain the meaning and intent of the testator from the language employed in the will. *Ibid.;* 2 Greenl. Ev. § 671.

With these general propositions in mind, we may, without infringing any rule of interstate comity, venture to ascertain, if we can, the intention of the testator as disclosed in this will, and also its validity, at least as to certain portions of the property.

4. The papers coming from the county court must be taken as the will of the testator. *Thornton v. Curling,* 8 Sim. 310; *Price v. Dewhurst, supra.* They consist in what has been called the will, with Schedules A and B therein mentioned and thereunto attached. In construing the will, we are to consider these three papers as one instrument in law, and together constituting the will of the testator. *Ackerly v. Vernon,* Com. 381; *S. C.* affirmed on appeal, 3 Brown, Parl. Cas. 91; *Hill v. Chapman,* 1 Ves. Jr. 407; *Habergham v. Vincent,* 2 Ves. Jr. 204; *Jackson v. Babcock,* 12 Johns. 394; *Loring v. Sumner,* 23 Pick. 102; *Baker's Appeal,* 107 Pa. St. 381; *Fickle v. Snepp,* 97 Ind. 289; *S. C.* 49 Am. Rep. 449.

5. It is claimed on the part of the executor that, under the directions of the will, all the personal property and all the real estate outside of Missouri must, for the purpose of determining the validity of the will or some of its provisions, be regarded as converted and permanently invested in lands in Kansas City, Missouri, under the well-known doctrine of equitable conversion. That doctrine is firmly established; and if it applies, or in so far as it applies, it must be enforced. It may be well to restate it, with some of its limitations. As long ago as the time of Lord Chancellor THURLOW it was observed by him "that nothing was better established than this principle: that money directed to be

employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted; and this, in whatever manner the direction is given,— whether by will" or otherwise. "The owner of the fund, or the contracting parties, may make land money, or money land. The cases established this rule universally. If any difficulty has arisen, it has arisen from special circumstances." *Fletcher v. Ashburner*, 1 Brown, Ch. 499. This was expressly sanctioned by the supreme court of the United States at an early day. *Craig v. Leslie*, 3 Wheat. 577. The reason for the rule is there stated by Mr. Justice WASHINGTON, speaking for the whole court, thus: "The principle upon which the whole of this doctrine is founded, is that a court of equity, regarding the substance and not the mere form and circumstances of agreements and other instruments, considers things directed or agreed to be done as having been actually performed, where nothing has intervened which ought to prevent a performance." From that and other cases the late chief justice of this court deduced this general rule: "When a will contains a power of sale not mandatory in terms, but it is apparent from the general scope and tenor of the will that the testator intended all his realty to be sold, the power of sale will be held imperative, and the doctrine of equitable conversion applied." *Dodge v. Williams*, 46 Wis. 97; *De Wolf v. Lawson*, 61 Wis. 477–479.

In Pennsylvania it has been held "that the equitable conversion of realty into personalty, by force of a direction in a deed or will to sell, only takes place where the direction is positive and absolute; . . . that if a proposed sale is contingent or eventual in a deed or will, equitable conversion does not follow." *Neely v. Grantham*, 58 Pa. St. 437. But the better opinion seems to be as in effect held in *Dodge v. Williams, supra*, that whenever a direction

to convert is apparent from the whole will, whether expressed or implied, then the duty and obligation to convert is imperative, and the doctrine of equitable conversion applies.   Thus, in *White v. Howard*, 46 N. Y. 162, GROVER, J., speaking for the court, said: "To constitute a conversion of real estate into personal, in the absence of an actual sale, it must be made the duty of, and obligatory upon, the trustees to sell it *in any event*.   Such conversion rests upon the principle that equity considers that as done which ought to have been done.   A mere discretionary power of selling produces no such result." *Power v. Cassidy*, 79 N. Y. 613, 614; *Hobson v. Hale*, 95 N. Y. 605.   So it has been held that, "where the general scheme of the will requires a conversion, the power of sale, although not in terms imperative, operates as a conversion; and this will be deemed to be immediate, although the donee of the power is vested, for the benefit of the estate, with a discretion as to the time of sale." *Lent v. Howard*, 89 N. Y. 169; *Ingrem v. Mackey*, 5 Redf. 357.   But the will must, in terms or by necessary implication, disclose an intent to convert, in order to sustain the theory of equitable conversion. *Hobson v. Hale*, *supra*.

6. Having thus stated some of the principles and some of the facts upon which the doctrine of equitable conversion rests, it becomes necessary to consider the application of those principles to some of the provisions of this will.

(*a*) The lands in Iowa are nowhere mentioned or referred to in the will or either of the schedules.   This being so, it is manifest that the doctrine of equitable conversion has no application to them.   They must therefore be regarded as lands in Iowa; and the validity of the will respecting such lands be determined by the laws of Iowa.

(*b*) The several pieces of land specifically described in Schedule B are all situated in Kansas City, Missouri.   Considering that schedule in connection with subdivision 5 of

the will, of which it forms a part, as we must, and the directions thereby given to the executors are that they "*shall*, *at*" their "discretion," "either" sell the several pieces of lands so described in Schedule B, and invest the proceeds thereof in more desirable rentable property in Kansas City, *or* use said proceeds in improving some of the testator's Kansas City properties. This mere discretionary authority can in no sense operate as an equitable conversion,— certainly not until an actual conversion should in fact occur. Besides, such conversion of the lands described, into other lands in the same city and state, could in no way affect or change their legal *status*. So they must be regarded as lands in Missouri, in determining the validity of the will respecting the same.

(*č*) By the sixth subdivision of the will, the testator expressly directs that all moneys, notes, bonds, mortgages, or other evidence of indebtedness to him from any and all parties, except his brothers, "*shall*, as soon as practicable after" his death, "be used either in the purchase of property in Kansas City, or for improving properties in said city then on hand." This clause of the will relates particularly to the $30,000 of personal property in dispute; and which, for the purposes of these appeals, is assumed to be the property of the estate. The direction to so convert is not prevented from being imperative by adding "as soon as practicable after" his death, and thus giving some discretion as to the time or times of such conversion. If such permanent investment of such personal estate in lands in Kansas City can be lawfully made, and then lawfully held as lands in Kansas City during the time and for the purposes expressed in the will, then there can be no doubt but what, subject to the widow's rights therein as hereinafter stated, the doctrine of equitable conversion is applicable to such personal estate, and in that event the same is accordingly to be regarded as lands in Missouri from the time of

the testator's death; otherwise not.   In other words, since the right to so convert is dependent upon the right to so invest and hold, the legality of such equitable conversion is dependent upon the same right to so invest and hold. Whether such investment and holding would be lawful or unlawful will be considered hereafter.

(d) The several pieces of land specifically described in Schedule A consist of the homestead in Madison, Wisconsin, and lands in Michigan and Kansas.   As the directions in relation to the homestead differ from the directions in relation to the other lands, the homestead will be considered by itself hereafter.   Considering Schedule A in connection with subdivision 4 of the will, of which it forms a part, as we must, and the directions thereby given as to the several pieces of land in Michigan and Kansas are to the effect that each and all of said pieces of land " *shall* be converted, *as soon as practicable*, after " the testator's death, " *at schedule prices*, or as much better as may be, . . . into good rentable ' inside ' property in Kansas City, Mo."   The testator manifestly had an exalted opinion of the present and future of Kansas City.   The scheme of his will indicates an intention to have his lands in Michigan and Kansas sold as soon as practicable, and the proceeds thereof invested in real estate in Kansas City.   He directs, in effect, that the several pieces of land mentioned shall be so converted as soon as practicable after his death.   Is such purpose to be frustrated merely by adding " at schedule prices, or as much better as may be "?   On the contrary, were not those words added as a guide to his executors, or for the purpose of stimulating purchasers to pay a larger price?   It seems to us that such was his intent, for, apparently with the same view, he added to the schedule price of each piece a still larger estimated value.   Of course, it may turn out to be impossible to ever sell some of the pieces at the schedule price; and yet there is nothing in the will indicating that he

ever contemplated such a result, or any permanent holding of such lands as a part of the estate, as is plainly indicated as to the Missouri lands. There are no negative words indicating an intent not to have any of the lands in Michigan or Kansas sold at a less price. As indicated in another connection, some discretion may be given as to the time or times of making such sales and investments, without preventing the application of the doctrine of equitable conversion. The only purpose manifest in the will for selling any of the Michigan or Kansas lands is to invest the proceeds of such sales in real estate in Kansas City, and then to hold such lands in that city as a part of the estate during the time and for the purposes indicated in the will. If such permanent investment can be lawfully made, and such lands so lawfully held, then we discover no reason why the doctrine of equitable conversion should not apply to them. Nevertheless, the legality of such equitable conversion is necessarily dependent upon the right to so invest and hold. Whether such investment and holding would be lawful or unlawful will be further considered hereafter. What has been thus said is not by way of determining the validity of the title to any lands outside of Wisconsin, nor the validity of any investment or trust in or tenure of such lands, but merely to ascertain the meaning and intent of the testator from the language employed in the will, which, as we have seen, is a duty devolving upon this jurisdiction.

(e) In regard to the homestead, the directions are, in effect, that it shall be converted, as soon as practicable after his death, into good rentable "inside" property in Kansas City, Missouri, "at schedule price," which is $10,000, or as much better as may be; and then, by subdivision 7 of the will, the testator directs, in effect, that his wife shall have the use of his homestead, furniture, and appurtenances so long as she may desire to live in it as her home; and that in case she at any time ceases to desire it as her home, he di-

rects that, as soon thereafter as practicable, it be sold "*at a price not less*" than $10,000, or as much more as the property will bring, and the proceeds thereof be invested in good rentable property in Kansas City, Missouri, and the rentals of such property be added to the income of the estate. Here are directions to sell and to invest the proceeds in real estate in Kansas City, it is true, but they are accompanied by other directions not to sell nor to so invest until after the concurrence of two events; one being that the widow shall cease to desire it as her home, and the other is that it be sold at a price not less than $10,000. The word "homestead," as used in the will, manifestly means the house and all the grounds where the testator lived, and is not restricted to the one-fourth of an acre mentioned in the statute. Sec. 2983, R. S. As stated, the widow has elected to take the provisions made for her by law, instead of the provisions made for her in the will, as required by the statutes. Sec. 2172. Upon making such election, the widow at once became entitled to the same dower in the testator's lands, and the same rights to the homestead, and the same share of his personal estate, as if he had died intestate, except that the share of personal estate which she so took was restricted to one third part of his net personal estate. Secs. 2172, 3935, R. S.; *Leach v. Leach*, 65 Wis. 291. Since the testator left a son as well as widow, her right to the homestead thus secured by such election is the right to such statutory homestead of one fourth of an acre during her widowhood, and dower in the balance of the land connected therewith. Subd. 2, sec. 2271, R. S. In other words, the extent and duration of her right in the homestead has been diminished by such election.

Can we hold that the direction in the will to sell the homestead and invest the proceeds as indicated, works an equitable conversion of the estate into Missouri lands? As observed, there is no such direction to convert until the

widow ceases to desire it for a home. Presumably this will not occur during her widowhood, which may be regarded as equivalent to a life estate. But the sale is expressly forbidden, even after the termination of the widow's right, at any price less than that specified. To apply the doctrine of equitable conversion to lands which are directed not to be sold until the termination of such life estate, nor then, except in an uncertain event which may never occur, would be to stretch that doctrine beyond anything authorized by or contemplated in the authorities. We must therefore hold that the homestead must be regarded as lands in Wisconsin, and accordingly the validity of the will respecting the same must be determined by the laws of Wisconsin.

7. Before determining such validity, and to aid such determination, it becomes necessary to ascertain, if we can, more fully the intention and meaning of the testator as disclosed by the language employed in other parts of his will. Undoubtedly the legal title to the personal property belonging to the estate is vested in the executor. *Scott v. West*, 63 Wis. 555, 556. Of course he holds the same for the benefit of the *cestui-que-trusts*, including the rights of the widow as indicated in the sections of the statute cited above. So far as the law will permit, the executor, by virtue of the will, has acquired all the rights therein given, and is charged with all the obligations therein imposed. *Ibid.* The several directions in the will are addressed to him and his successors in office and his subordinates, whether by ancillary administration or otherwise. He and they are to execute the will so far as the law will permit. He and they are to pay the testator's lawful debts and funeral expenses from moneys on hand at his death, and, if they are insufficient, then the balance from the income of the estate. He and they are to pay the necessary expenses of carrying the estate from year to year from the income thereof. The will impliedly excludes the whole of the

homestead, while occupied by the widow as such, from being a source of income to the estate, but provides that in case of its conversion as indicated, then the rentals of such newly acquired property are to be added to the income of the estate.

By the election of the widow to take under the statute instead of the will, the bequest to her in the eighth subdivision of the will of "one quarter of the net annual income of the *remainder*" of the "estate during her natural life," which by the twelfth subdivision was to be kept up to $1,500 from the share of the income given to the son, becomes inoperative. By such election a portion of the home property not included in the statutory homestead nor the widow's right of dower in the balance, might be the source of a trifling income to the estate; but this would be dependent upon the validity of the provision in the will for the future conversion of the homestead, of which we shall presently speak. By the direction in the ninth subdivision of the will the son is to have one quarter of the net annual income of the estate (exclusive of the homestead) until, under the provisions of the will, he comes into the possession of the entire estate, except as the same may be sooner terminated by his death. By the direction in the tenth subdivision of the will the brother Edward Irving is to have one quarter of the net annual income of the estate (exclusive of the homestead) during his natural life. By the direction in the eleventh subdivision of the will the brothers *Joseph C.* and Henry T. were "each" to have one eighth of the net annual income of the estate (exclusive of the homestead) during their natural lives. Such bequests annually from the "net annual income" of the estate are clearly severable, as each is independent of the other and almost necessarily must terminate at a different time than any of the others. Since the annual share of each such legatee is each year confined to such "one quarter" or "one

eighth" of such net annual income of the estate, it manifestly cannot be increased by the one-quarter of such net annual income now undisposed of by reason of the election of the widow. As the undisposed of one-fourth of such net annual income cannot arise from the rents, issues, or profits of lands in Wisconsin, but must arise from the rents, issues, and profits of lands outside of this state, or from the personal estate liable to be treated as converted into Missouri lands as indicated, we reserve further consideration of the question whether the accumulation of such undisposed of net annual income into the *residuum* of the estate would or would not be valid. Manifestly, it is the theory of the will that the several fractional shares of such net annual income thus bequeathed will from time to time be diminished, as portions of the *corpus* of the estate may pass to *Marcus* under the twelfth clause of the will; for, the moment he may become the absolute owner in fee of any portion of the land thereby devised, that moment such portion will become segregated from the estate and thereby relieved from every provision of the will. So, whatever property the widow, by reason of her election, takes under the statutes of the several states, becomes in like manner segregated from the estate. It is only the one-quarter or the one-eighth of the net annual income of the *testator's estate* that is thus bequeathed; not such fractional share of the net annual income of what may become the estate of *Marcus* or the widow.

By the will *Marcus* is to have no portion of the *corpus* of the estate, except as he becomes entitled to it under the direction in the twelfth subdivision of the will, and by such direction he is only to become the owner in fee of a portion of the *corpus* of the estate when he "reaches his majority," and then additional instalments of such *corpus* from time to time until he reaches the age of forty years, when "*the remainder*" of the "*estate*" is to become his.

But in the event of *Marcus* dying "*after* reaching his majority, leaving one or more legitimate children of his body," then the direction of the thirteenth subdivision of the will is "that the income of forty thousand dollars' worth of" his "estate, or so much thereof as may in prudence be necessary, shall be used for the proper support of such child or children, until they shall severally become of legal age, when an equal part of the above-named principal and accrued interest shall become his or hers absolutely." That is to say, immediately upon the death of *Marcus* after so reaching his majority and before becoming forty years of age, leaving such child or children him surviving, the $40,000 "*worth of*" the "estate," if there shall be so much, is to be regarded as segregated from the rest and held in trust for them "until they shall severally become of legal age," as therein directed. "In the *event*" that *Marcus* "shall survive all" the "other legatees," that is to say, shall survive the widow and each of the three brothers, "and then die before coming into the possession" of the "whole estate," then the fourteenth subdivision of the will directs "that *the remainder*" of the "estate, *as of that date*, shall belong to *Hamilton College*." But the words "the remainder of my estate," as here used, cannot mean what will be the entire estate at the time of such death of *Marcus*, unless it so happens that upon such death he leaves no such child or children him surviving. But in case he does leave such child or children him surviving, then such "remainder" of the estate will only be what may remain of such estate after setting apart the $40,000 worth of the estate for the benefit of such child or children, as provided in the thirteenth subdivision of the will. Such must be the construction, for, unless the words "the remainder of my estate" be so limited, the fourteenth subdivision of the will would be clearly repugnant to the provisions made for such child or children in the thirteenth subdivision, for it could not

have been the intention to give as a remainder of the estate, to *Hamilton College*, the $40,000 which might thus be set apart for such child or children.

If either the wife or one of the brothers shall become the only surviving legatee, then "*in that event*" the fifteenth subdivision of the will directs that the "estate *at that time* be divided as nearly as may be into two equal parts as regards value and renting power, and said wife or brother shall then choose between the incomes of said two properties, and have and enjoy the same during his or her natural life;" and "the other part" of the "estate shall *at that date* become the property of *Hamilton College;*" and "at the death of said wife or brother the *remaining* part" of the "estate shall become the property of *Hamilton College.*" The words "my only surviving legatee," as used in this last subdivision of the will, imply, at least, that all other legatees named in the will and living at the time of the testator's death, including *Marcus*, shall, previous to the time of such sole survivorship, have died leaving some portion of the *corpus* of the estate which had not before passed to the widow, to *Marcus*, or for the benefit of such child or children by segregation, as indicated. It may occur that all three brothers die before *Marcus*, or that the widow and two of the brothers die before *Marcus*, and then, after reaching his majority, *Marcus* dies, leaving one or more such children him surviving. In that event, the words, "my estate at that time be divided as nearly as may be into two equal parts," as used in the last subdivision of the will, manifestly mean only so much of the estate as may then remain after setting apart the $40,000 worth of the estate for the benefit of such child or children, as provided in the thirteenth subdivision of the will.

Such are the provisions of the will we are called upon to consider. Undoubtedly the will created in the executor an express trust, within the meaning of sec. 2081, R. S. In

fact he is required to do much more than to merely sell or lease lands for the benefit of legatees. He is required to do much more than merely to receive the rents and profits of lands and apply them to the use of a person during the life of such person or for any shorter term. He is required to do much more than merely to receive the rents and profits of lands and to accumulate the same for any of the purposes and within the limits of ch. 95, R. S. He manifestly is to take, hold, and manage the estate for the beneficial interest of the several persons living and to be born as indicated. Such duties clearly imply that he is to take a legal title to the whole estate in trust for the purposes mentioned. *Scott v. West*, 63 Wis. 558–562; sec. 2086, R. S.

The will throughout deals with the estate of the testator. It uses the words " my estate," or their equivalent, some sixteen different times. It is such estate that the executor and his successor and subordinates are charged by the will with managing, converting, renting, improving, gathering, and dividing and paying over the income annually, and from time to time segregating, and finally dividing the *corpus* of the estate, and then giving up the *residuum*. Subject to such segregations from time to time, they are required to so hold and manage the *corpus* of such estate until the same finally passes wholly to the son, at the age of forty (should he live so long), twenty-eight years after the testator's death. Should he die after reaching his majority and before becoming forty, leaving one or more such children, then such executor, etc., is required to set apart the $40,000 worth of said estate, which may include the Wisconsin land or even the whole of the remainder of the estate, and hold and manage the same until such children severally become of age. The time for such setting apart may commence soon after *Marcus* becomes twenty-one, or not until just before he reaches forty, and then continue twenty-one years thereafter. No one can tell how many of

such children may be born, or whether any or how many may reach their majority.

Thus, according to the will, the estate, including the Wisconsin land,.is liable to be so tied up from thirty to forty-eight years after the testator's death. But even if *Marcus* does not so die leaving such children, still, by the fourteenth and fifteenth subdivisions of the will, the estate, including the Wisconsin land, is liable to be so tied up until *Marcus* and the widow and the three brothers are all dead save one, either the widow or one of the brothers, as the "only surviving legatee." In other words, at least four, if not all, of these five persons, living at the time of the testator's death, must die before either of those subdivisions of the will can become operative. During such periods, or large portions of them, it is impossible to tell where the *corpus* of the estate will finally go by the terms of the will. If *Marcus* lives long enough, then all is to go to him. If he dies during the next nineteen years after he becomes of age, leaving children, then a large portion of it and possibly the whole may go to them. If he survives all the other legatees named, and then dies during that period, then a portion of it will probably go to *Hamilton College;* but no one can tell how much, nor, for certain, whether any. If he dies under twenty-one, even though he leave children him surviving, yet neither he, nor such children, nor his heirs at law, are to have any of such *corpus.* But even then such *corpus* is, by the will, to remain tied up during the times and for the purposes named, and only go to *Hamilton College* upon the occurrence of the events mentioned.

The necessity of the *corpus* of the estate being held by a trustee during such several periods and awaiting such several contingencies and possibilities, seems to be absolute. *Scott v. West, supra.* Such trustee or executor is directed to sell some lands and buy others, but he has no authority under the will to pervert or alienate any portion of the

estate, in contravention of the trust. . Sec. 2091, R. S.; *De Wolf v. Lawson*, 61 Wis. 475. In other words, the *corpus* of the estate is inalienable during the continuance of the trust. Should the trustee die, it would become necessary to appoint a successor; and even while he lives there may be a necessity for an ancillary administration.

Under this will and our statutes, can we hold that there is no unlawful suspension of the power of alienation as to this Wisconsin land? As indicated, upon the death of the testator the widow took under the will a present life estate in that land; and she has now substantially the same under the statutes. According to the will, the executor, as trustee, took a future estate in trust in the same land, for it was "limited to commence in possession at a future day." Sec. 2034, R. S.; *Scott v. West*, 63 Wis. 570. "Future estates," under our statute, "are either vested or contingent." Sec. 2037, R. S. "They are vested when there is a person in being who would have an immediate right to *the possession* of the lands, upon the ceasing of the intermediate or precedent estate." *Ibid.* By the terms of the will, the trustee or executor was to take such future vested estate in the homestead. As to the other property he took a present vested estate. *Coster v. Lorillard*, 14 Wend. 302, 303. But neither *Marcus* nor *Hamilton College* had anything more than a contingent interest therein; for the statute expressly declares that such "future estates . . . are contingent while the person to whom, or the event upon which, they are limited to take effect, remains uncertain." Sec. 2037. "These definitions of vested and contingent remainders," said SAVAGE, C. J., "are very different from the common-law definitions of those estates." *Coster v. Lorillard*, 14 Wend. 301. They took no vested interest in the land, and could convey none. Secs. 2086, 2089, R. S.; *De Wolf v. Lawson*, 61 Wis. 475, 476. Under our statute, "every future estate," whether vested *or* contingent, is "void in its

creation," which "suspends the absolute power of aliena-
tion  .  .  .  for a longer period than during the continu-
ance of two lives in being at the creation of the estate,"
etc.   Secs. 2038, 2039, R. S.; *De Wolf v. Lawson*, 61 Wis.
473.   The only exception to this, which is in sec. 2040, is
clearly not applicable here.

To avoid all uncertainty, one of the same sections de-
clares that such "absolute power of alienation shall not be
suspended by any limitation or condition whatever," and
the other declares that "such power is suspended when
there are no persons in being by whom an absolute fee *in
possession* can be conveyed." Since the trustee cannot,
under the will, relinquish the trust, which includes the
"possession," until the purposes of the trust are fulfilled as
the several periods for such fulfilment transpire; and since
persons are liable to be born who by the terms of the in-
strument will be entitled to a large portion, and possibly
the whole, of what may then remain of the estate, includ-
ing this homestead,— it is very obvious that "there are no
persons in being by whom an absolute fee *in possession*
can be conveyed," within the meaning of the statutes; and
since this state of things must, under the will, continue for
a longer period than two lives in being at the creation of
the estate, such suspension, as to this homestead, must be
adjudged contrary to the statute, and therefore absolutely
void.   *Coster v. Lorillard*, 14 Wend. 317–324; *Hawley v.
James*, 16 Wend. 121, 122, 164, 165, 174–179.

It is impossible to escape this conclusion by speculating
as to the probabilities of *Marcus* and his unborn children
eventually getting this Wisconsin land under the will.   We
have no authority to speculate upon the chances.   The
rule is universal that such suspension of the power of
alienation must necessarily terminate, under any and all
circumstances, within the period prescribed by the statute,
or the disposition will be void.   *Schettler v. Smith*, 41 N. Y.

328; *Knox v. Jones*, 47 N. Y. 397. Nor is it possible to escape such conclusion on the theory that the trustee or executor merely has a power in trust to sell such homestead; for, as indicated, neither the future estate of *Marcus* nor *Hamilton College* therein is anything more than contingent under our statutes. We must therefore hold that the attempted disposition of the homestead by the will is void, and that upon the death of the testator the same descended to *Marcus*, subject to the widow's rights therein as indicated under the statutes.

8. It is strenuously urged, in effect, that, as the testator's residence and domicile were in this state at the time of making his will and his death, he could thereby create no valid trust except such as are sanctioned by the laws of this state. In other words, that he could not by such a will, under the doctrine of equitable conversion, cause his personal property and his lands in Michigan and Kansas to be converted into lands in Kansas City, Missouri, and there held as his estate, and the power of the alienation thereof suspended beyond the time authorized by our statutes, even though such suspension would be valid under the laws of Missouri; and that the question as to the validity of such suspension is properly determinable by this jurisdiction. I frankly confess that I was deeply impressed upon the hearing with the plausibility and force of this argument. The will was here admitted to probate. The executor here qualified and received his commission from the county court. He is directly accountable to and subject to the orders of that court. There may, necessarily, be ancillary administrations in other states, but they will in law be subordinate to this, which must be regarded as the principal administration. But in such intricate matters of title and jurisdiction impressions are of no value unless supported by the logic of the law, if not by authority.

In *Curtis v. Hutton*, 14 Ves. Jr. 537, cited by counsel, the

testator devised real estate in England in trust to be sold, and the proceeds of the sale, with the personal estate upon trust, to be laid out in lands for the maintenance of a charity in Scotland, and it was held void as to the real estate, but valid as to the personal property, by the effect of the option. The reason for holding such devise of such real estate in England void, as given by Sir William GRANT, M. R., was that "the owners of such property are *disabled* from disposing of it to *any charitable use*, except by deed executed *twelve months before* the death of the owner, etc., to take effect from the execution." Page 541. Such disability of otherwise disposing of such land was held, in effect, could not be frustrated by the doctrine of equitable conversion. That decision is the foundation of sec. 479*d* of Story's Conflict of Laws, which cannot be regarded as of any greater authority; nor does it squarely meet the question here presented. Nine years after that decision the same learned Master of the Rolls, in a case where the testator by his will directed his executors to dispose of all his real and personal property at Grenada, in the West Indies, and remit the proceeds to England to be laid out as a charitable fund in the best manner possible, held that such directions were not void, as the statute of mortmain did not extend to Grenada. *Attorney General v. Stewart*, 2 Meriv. 143.

In *Attorney General v. Mill*, 2 Dow & C. 393, the testator by his will, made in England where he was at the time domiciled and so remained until his death, gave his personal and real estate (none of the latter being in England or Scotland, but in the West Indies) to trustees, to be laid out in the purchase of lands or rents of inheritance in fee simple, for a charitable purpose, at Montrose, in Scotland; and it was held by the House of Lords, affirming the decree of the Chancellor, "that the bequest was void by the statute of mortmain, it not appearing from the will that the testator intended that the trustees should have the option

to purchase lands in Scotland." The plain inference from the opinion is that had the will directed the purchase of the lands in Scotland, then it would have been valid, as the law there did not prevent such purchase.

In *Fordyce v. Bridges*, 2 Phil. 515, Lord Chancellor COTTENHAM, speaking of this subject, said: "An objection was made that the bequest of a fund to be invested in a regular Scotch entail was void as a perpetuity. The rules acted upon by the courts in this country with respect to testamentary dispositions tending to perpetuities, relate to this country only. What the law of Scotland may be upon such a subject, the courts of this country have no judicial knowledge, nor will they, I apprehend, inquire; the fund being to be administered in a foreign country is payable here, though the purpose to which it is to be applied would have been illegal if the administration of the fund had been to take place in this country. This is exemplified by the well-established rule in cases of bequests within the statutes of mortmain. A charity legacy void in this country under the statute of mortmain is good and payable here if for a charity in Scotland. . . . The objection raised upon the ground of perpetuity cannot be maintained." This seems to be peculiarly applicable to the personal estate here.

It is said that *Freke v. Lord Carbery*, L. R. 16 Eq. Cas. 461, is to the contrary. In that case the testator was a *domiciled Irishman* in Ireland, who, after disposing of personal estate in trust, "gave his leasehold house in Belgrave square, England, to the same trustees, upon trust to sell" as directed, and to apply the proceeds in discharge of any incumbrance on the same, and the residue to invest in government or real securities, and hold the same upon such trusts as declared. "The validity of the trusts for accumulation was not disputed, so far as they related to the testator's government stocks and funds and other pure personalty. But the question was raised whether these trusts were valid as to

the proceeds of the sale of the house in Belgrave square,". and it was held that "the Thellusson act applied to the English leasehold and the proceeds of the sale thereof, and that the trust for accumulation of the investments of the proceeds of the sale in excess of the periods permitted by that act was invalid." This is clearly distinguishable from the other cases cited, and is an authority to the point that the law of the place where the land is situated governs as to the validity of its disposition by will, instead of the law of the testator's domicile, as here claimed.

In the celebrated case of *Hawley v. James*, 5 Paige, 337, 16 Wend. 74, 381, and 7 Paige, 213, the testator was domiciled in Albany, New York. By his will he directed all his lands outside of New York city, Albany, and Syracuse, including 40,000 acres in the state of Illinois, to be sold, and the proceeds thereof to be invested in lands in the three cities named, upon trusts which, under the statutes like ours cited, were held void. But in respect to any lands of the testator situated in the state of Illinois or elsewhere outside of the state of New York, the decree which was entered by the court of errors stated that it was not to be deemed a decision upon the title of the said trustees to those lands, or their power over them (16 Wend. 281), which question was thereby remitted for further consideration to the court of chancery. Upon the cause being remitted to the chancellor, an application was made for further directions in pursuance of such decree. Upon a full hearing, the learned chancellor said: "This court has no jurisdiction to make a decree which will directly affect either the legal or equitable title to lands situated in another state. And if the legal title to the lands now in question was in any of the infant parties according to the laws of Illinois, or if those who had the legal title were out of the jurisdiction of this court, so that it would be impossible for it to operate upon them *personally* to compel them to execute the trust or to

convey the legal title according to the decree, I should con-
sider it my duty to dismiss the application and to refer the
parties to the courts of the state where the trust property
is situated." Then, after showing that the will had been
executed in conformity to the laws of Illinois, so as to vest
the legal title to the lands in that state in the trustees, and
that as the object of the testator in directing a sale of the
Illinois lands and a conversion of the same into money was
to buy lands in the state of New York and hold them upon
trusts which were contrary to the statutes of that state and
therefore illegal, the trustees were deemed to hold the title
to the Illinois lands in trust *for the heirs;* and, as the trust-
ees were all within the jurisdiction of the court, they were
accordingly directed to convey the same to the heirs. 7
Paige, 213.

In *Burrill v. Sheil,* 2 Barb. 457, the testator, domiciled
in New York, directed lands in that state to be sold and a
portion of the proceeds invested in England; and, as no
law was thereby violated, it was held that the courts of
New York had no power to divert the investment from
England and direct the same to be made in New York, ex-
cept with the consent of all the parties interested; and, as
some were infants, such consent could not be obtained.

In *Bascom v. Albertson,* 34 N. Y. 584, a bequest by a New
York testator was made to five such persons as the supreme
court of Vermont should appoint to be trustees, to found,
establish, and manage an institution for the education of
females, to be located at Middlebury, Vermont, and it was
held ineffectual for any purpose, since the object of the be-
quest was unlawful in the state of the testator's domicile.
This is in harmony with the second proposition announced
in this opinion.

In *Chamberlain v. Chamberlain,* 43 N. Y. 424, the testator
was domiciled in the state of New York, and, among other
things, he bequeathed a certain amount to the " Centenary

Fund Society, a corporation created under the laws of Pennsylvania for charitable and benevolent purposes." In passing upon its validity, the court held that "the law of the testator's domicile controls as to the formal requisites essential to the validity of the will, the capacity of the testator, and the construction of the instrument. When, by the *lex domicilii*, a will has all the formal requisites to pass title to personalty, the validity of particular bequests will depend upon the law of the domicile of the legatee, except in cases where the law of the domicile of the testator in terms forbids bequests for any particular purpose or in any particular manner, in which latter case the bequest would be void everywhere." The learned justice giving the opinion said: "So far as the validity of bequests depends upon the general law and policy of the state affecting property and its acquisition generally, and relating to its accumulation and a suspension of ownership and the power of alienation, each state is sovereign as to all property within its territory, whether real or personal. It is no part of the policy of the state of New York to interdict perpetuities or gifts in mortmain in Pennsylvania or California. Each state determines those matters according to its own views of policy or right, and no other state has any interest in the question; and there is no reason why the courts of this state should follow the funds bequeathed to the Centenary Fund Society to Pennsylvania to see whether they will there be administered in all respects in strict harmony with our policy and our laws." Page 434. To the same effect is *Mapes v. Am. H. M. Soc.* 33 Hun, 360; *Bible Soc. v. Pendleton*, 7 W. Va. 79.

This case of *Chamberlain v. Chamberlain* is in harmony with subsequent decisions in the same state, in which it has been held, in effect, that, in the absence of any equitable conversion, the question as to the unlawful suspension of the power of alienation of lands in New York must be

governed by the laws of that state, notwithstanding the testator who attempted to dispose of the same was at the time of making his will and his death domiciled in some other state, as, for instance, in Connecticut, Massachusetts, or California; as will appear by *White v. Howard*, 46 N. Y. 144; *Despard v. Churchill*, 53 N. Y. 192; *Hobson v. Hale*, 95 N. Y. 588. The only case cited which seems to be in conflict with the principles stated is *Wood v. Wood*, 5 Paige, 596. But that is expressly overruled in *Chamberlain v. Chamberlain*, 43 N. Y. 435, and impliedly so in other cases.

It is unnecessary to look further into the authorities. The difficulty in holding that the laws and courts of this state may interdict the conversion of personal property into lands in Missouri, or lands in Michigan or Kansas into lands in Kansas City, is apparent when we remember that the laws of this state have no extra-territorial force, and the courts of Wisconsin have no extra-state jurisdiction. The principles of law thus indicated are in strict harmony with the rulings of this court in *Van Steenwyck v. Washburn*, 59 Wis. 510, 511.

We must therefore disclaim jurisdiction to determine the title to any of the lands outside of Wisconsin, or the legality of accumulations of rents and profits therefrom. It follows that the validity of the proposed conversion of personal property into lands in Kansas City must be determined by the laws and courts of Missouri. So the question of the validity of the proposed conversion of lands in other states into lands in the same city would seem to be determinable by the same jurisdiction, but of this we have no authority to decide. Such questions of the validity of such conversions should be determined at an early day by instituting the proper suit in the proper jurisdiction.

The costs and disbursements of all parties in this court and the circuit court are payable out of the estate. The county court will make such allowance to the respective

parties out of the estate for counsel fees as, in the exercise of a sound discretion, may be just.

*By the Court.*— The judgment of the circuit court is reversed on each of the four appeals, and the cause is remanded with directions to enter judgment in accordance with, and to the extent indicated in, this opinion, but leaving open for further action the questions as to the validity of such conversions, suspensions, and accumulations, until authoritatively determined by the rightful jurisdiction.

Motions for a rehearing, made by each of the several parties, were denied November 22, 1887.

See *Palms v. Palms*, 36 N. W. Rep. (Mich.), 419.— Rep.